## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR A SAMSUNG GALAXY PHONE LOCATED AT 275 CHESTNUT ST, MANCHESTER, NH

I, Lori Robinson, having been duly sworn, hereby depose and state:

## AGENT BACKGROUND

1.       I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since 2014. I am currently assigned to the Manchester, New Hampshire field office. As part of my regular duties as an agent, I investigate criminal violations relating to a broad range of immigration and customs related statutes, including those relating to child exploitation, child pornography, and human trafficking. I have received training in the area of child pornography and child exploitation, and as part of my duties have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. §2256) in various forms of media, including digital/computer media. I have assisted investigations and executed search warrants involving child exploitation and child pornography offenses, including search warrants of electronic devices. I have received training relating to the trafficking in persons, including sex trafficking, and other offenses.

2.       I have participated in investigations of human trafficking, human smuggling, alien harboring, border violations, drug and firearm trafficking, and related offenses. Many of these investigations have had national or international connections, and many required me to work closely and share information and intelligence with members of other federal, state, and local law enforcement agencies. I have debriefed defendants, informants, and witnesses who have personal knowledge about human trafficking, including sex trafficking, and other crimes occurring in New Hampshire, nationally, and abroad.

3.      From my training and experience, I know that individuals are trafficked for several purposes.  Some of these purposes are subjection into involuntary servitude, peonage, debt bondage and slavery. Human trafficking is often accomplished through the use of fraud, force and coercion.  I am familiar with the federal and state laws which make it a violation to engage in human trafficking, such as 18 U.S.C. §§ 1581 through 1595 (Peonage, Slavery and Trafficking in Persons), and 18 U.S.C. §§ 2421 through 2428 (Transportation for Illegal Sexual Activity and Related Crimes).

4.      I submit this affidavit pursuant to Federal Rule of Criminal Procedure 41, in support of an application for a search warrant authorizing the search of a Samsung Galaxy phone seized from the person of ARTHUR PICANCO on November 14, 2024, located at HSI Manchester, 275 Chestnut St, Manchester, NH, as more fully described in Attachment A of this affidavit (the "TARGET DEVICE").

5.      Based on the information set forth in this affidavit, there is probable cause to believe that the TARGET DEVICE contains evidence of, or property intended for use in committing, violations of Title 18, United States Code, Sections 1591(a) and (b)(1), and 1594 (attempted sex trafficking of a minor).  Moreover, I respectfully submit that there is probable cause to believe that a search of the TARGET DEVICE, further identified in Attachment A, for the items and information more particularly described in Attachment B, will yield evidence of the aforementioned violations.

6.      This affidavit is based on my personal investigation and investigation by others, including federal and local law enforcement officials whom I know to be reliable and trustworthy. The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means.  This

affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## **FACTUAL BACKGROUND**

7.      Beginning on or about November 13, 2024, law enforcement posted an advertisement (the "Advertisement") on a website commonly used to advertise prostitution services that contained images of what appeared to depict two young females and the following language:

> "Sweet & tight! Ready 2 have some fun!"
> "In town 4 a limited time only"
> "Cute & very petite girl that is tight from head to toe! Cum over to play with me!"
> "Text for donations. Incall only – safe and discrete location."

8.      The Advertisement listed the age as 99 years old[1] and contained a contact phone number (the "Advertisement Number") that was monitored by law enforcement and operated by an undercover officer ("UC1").

9.      On or about November 14, 2024, the Advertisement Number received a text message from a phone number ending in -4372, now known to belong to ARTHUR PICANCO ("PICANCO"), in response to the Advertisement.  Thereafter, a text conversation between UC1 and PICANCO ensued.  UC1 stated that they had two minor girls—ages 12 years old and 14 years old—available for various sex acts in exchange for money.  PICANCO agreed to pay $100 to have sex with the 14-year-old girl:

| PICANCO | Hi |
|---------|-----|
| UC1 | hello hello |

---

[1] The website utilized by law enforcement requires users to be at least 18 years old to utilize the website's services.

| PICANCO | Are you in New Hampshire |
|---|---|
| UC1 | ya hun my girls are in manchester 😊 |
| PICANCO | Your girls? Any in salem nh? |
| UC1 | ya hun theyre my daughters. no sorry |
| PICANCO | Are you affiliated with any type of law enforcement |
| UC1 | No!!! Are you? im not lookin for any trouble |
| PICANCO | No, I'm not |
| PICANCO | So i need more pictures of your girls please |
| PICANCO | Im not a cop |
| UC1 | what u lookin for?? hr or hh? |
| UC1 | i can send one more pic of each but i dont send more |
| PICANCO | I was looking for pictures |
| PICANCO | Ok lets see |
| UC1 | this is my leila shes 14 yo but very experienced |
| UC1 | [Photograph sent] [2] |
| UC1 | this is my sweet izzy shes 12 yo but is learning |
| UC1 | but a really  beauty |
| PICANCO | Do you have any that are legal |
| UC1 | no hun sorry |
| PICANCO | I need you to say that you are not affiliated with any type of law enforcement |
| PICANCO | Im not interested. They are too young |
| PICANCO |  [Photograph sent] |
| PICANCO | Im not a pedophile |
| PICANCO | Stop doing that to those kids |
| UC1 | its really not a big deal.. its not like i force them plus they love the $$ |
| UC1 | and im not a cop!!! r u?? i m not lookin for trouble |
| PICANCO | I think you're a cop. |
| PICANCO | Text me that you are not affiliated with any type of law enforcement.  Say that |
| UC1 | I AM NOT AFFILIATED WITH ANY TYPE OF LAW ENFORCEMENT |
| PICANCO | What are the rates. Just curious |
| PICANCO | If you're not a cop then why did you tell me the ages |
| UC1 | if u wanna see one its $150hh[3] or hr $300 if ud rather see both its $400 hr or $200 hh |
| UC1 | bc theres guys that r not interested n im not giving out our location to just anyone who is not interested |

---

[2] Photographs sent did not depict an actual minor.

[3] I know, based on my training and experience, that "hh" stands for "half hour" and "hr" is an abbreviation for "hour."

| | |
|---|---|
| PICANCO | If i go it would be for 100qv[4] |
| UC1 | ya thats fine.. with one girl |
| PICANCO | You have to call me and tell me you're not a cop |
| UC1 | give me a call if u wanna chat |
| PICANCO | You call me |
| UC1 | if ur not interested its okay. this isnt for everyone |
| PICANCO | I said you have to call me |
| UC1 | [Phone call made][5] |
| PICANCO | Can i see the face of the other girl |
| UC1 | [Photograph sent] |
| PICANCO | Shes asian? |
| UC1 | ya her dad is |
| PICANCO | The other girk is not asian |
| UC1 | diff daddy |
| PICANCO | I think you're a cop |
| UC1 | idk how many times i have to tell u im not a cop |
| UC1 | how about u just go find something else .. i dont have time for games |
| PICANCO | Im just nervous. The rest of my life depends on this decision |
| UC1 | u n i... u know i can get my girls taken away right? n i go to jail |
| UC1 | theres plenty of older woman available |
| PICANCO | What is the address |
| UC1 | which girl u gonna want? were in manchester |
| PICANCO | Can I pick when I get there |
| UC1 | u want hh or hr?? |
| UC1 | also are you clean or u gonna bring condoms?? |
| UC1 | what time u wanna come? |
| PICANCO | We already talked about 100qv for 20 minutes.  You dont have condoms? I can leave here now |
| UC1 | i just wanted to make sure u didnt want bare bc thats more $$ |
| PICANCO | No i don't |
| UC1 | u know which girl u want? just need to know bc i have another client that wants to come now |
| PICANCO | It will take me 30 minutes to get there |
| UC1 | okay but u want leila or izzy |
| UC1 | dont want u coming n whichever u want is busy |
| PICANCO | Whatever one is available |
| PICANCO | The older one |
| UC1 | u wanna come now? or when? |

[4] I know, based on my training and experience, that "QV" stands for "quick visit" or a 15-minute visit.

[5] An undercover officer ("UC2"), posing as the Advertisement Number called PICANCO's number and spoke to him for 3 minutes and 52 seconds. The content of the phone call was similar to the content of the text messages.

| PICANCO | Now. Like i said, it will take me 30 minutes to get there |
| PICANCO | I need the address |

10.     UC1 then provided PICANCO the address of a hotel in Manchester, NH ("Hotel") as the location of the date with the 14-year-old girl.

11.     Shortly thereafter, PICANCO arrived at the Hotel in a Black Toyota Camry. PICANCO pulled his vehicle up to where UC2 was standing in the parking lot of the Hotel. He rolled down his window and the two had a conversation. PICANCO expressed nervousness about the transaction. PICANCO confirmed that he wanted to go up to the Hotel room to meet the 14-year-old and that he had the cash to pay for the transaction. UC2 offered PICANCO the Hotel room key and confirmed the room number. PICANCO accepted the key from UC2.

12.     Law enforcement then arrested PICANCO in his vehicle and took him into custody. PICANO's phone was in the vehicle, plugged into the vehicle. Law enforcement officers called the number that UC1 had been using to communicate with PICANO and the phone in the vehicle rang, as depicted in the below photo.[6] Officers then seized the TARGET DEVICE.

---

[6] I have redacted the law enforcement officer's telephone number from the photo.



13.    Because PICANCO communicated with UC1 via text message, and because this was the device with the phone number utilized to communicate with UC1, there is probable cause to believe that the TARGET DEVICE contains his conversations with UC1 regarding his agreement to engage in commercial sex with a minor and may contain other evidence of this or related offenses.

## CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

14.    Based on my training and experience, I am aware that individuals who have a sexual interest in children often use cell phones to communicate with multiple minors or adult intermediaries for sexual purposes. I am also aware that said individuals may have multiple cell

phones to communicate with minors or other individuals about engaging in sexual activity with minors to avoid detection by others, including law enforcement. I am aware that individuals often use websites including but not limited to skipthegames, onlyfans, megapersonals, onebackpage, and adultsearch to engage in prostitution and/or sex trafficking of minors.

15.    Furthermore, I know, from my training and experience, individuals with a sexual interest in children tend to use their mobile devices to access websites advertising commercial sex, such as the website on which the Advertisement was posted.

16.    Additionally, I know, from my training and experience, that individuals with a sexual interest in children tend to view and maintain child pornography on their electronic devices. As a result, law enforcement is generally able to recover media files of child pornography from electronic devices, and may be able to recover evidence of such files even if the files have been deleted.

17.    These individuals may also have images of minors that do not rise to the level of child pornography, but which nonetheless provide insight and corroboration into their deviant sexual fantasies involving minors.  For instance, offenders have been known to take and maintain photographs and video recordings of fully clothed minors, not just in sexually provocative poses, but in public places and elsewhere (such as beaches, parks, and so forth), to collect, review, and fulfill their sexual fantasies.  This sort of material, although not overtly sexual, further demonstrates that the defendant has a sexual interest in minors.

18.    Obtaining information for 30 days prior to the arrest will help combat any defense that PICANCO traveled to the hotel in Manchester, NH, as part of some type of routine or schedule or that he did so in an attempt to rescue or otherwise assist the purported youth.

*Investigators' Possession of the Target Equipment*

19.     After taking possession of the TARGET DEVICE investigators placed the TARGET DEVICE in airplane mode.  The TARGET DEVICE is currently being stored by investigators at 275 Chestnut St, Manchester, NH.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

## TECHNICAL TERMS

20.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing
and downloading information from the Internet.  Wireless telephones may also
include global positioning system ("GPS") technology for determining the
location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital
picture files, rather than by using photographic film.  Digital cameras use a
variety of fixed and removable storage media to store their recorded images.
Images can usually be retrieved by connecting the camera to a computer or by
connecting the removable storage medium to a separate reader.  Removable
storage media include various types of flash memory cards or miniature hard
drives.  Most digital cameras also include a screen for viewing the stored images.
This storage media can contain any digital data, including data unrelated to
photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio, video,
or photographic files.  However, a portable media player can also store other
digital data.  Some portable media players can use removable storage media.
Removable storage media include various types of flash memory cards or
miniature hard drives.  This removable storage media can also store any digital
data.  Depending on the model, a portable media player may have the ability to
store very large amounts of electronic data and may offer additional features such
as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved
in such navigation.  The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite
contains an extremely accurate clock.  Each satellite repeatedly transmits by radio
a mathematical representation of the current time, combined with a special
sequence of numbers.  These signals are sent by radio, using specifications that
are publicly available.  A GPS antenna on Earth can receive those signals.  When
a GPS antenna receives signals from at least four satellites, a computer connected
to that antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs.  Some PDAs also function as wireless communication
devices and are used to access the Internet and send and receive e-mail.  PDAs
usually include a memory card or other removable storage media for storing data
and a keyboard and/or touch screen for entering data.  Removable storage media
include various types of flash memory cards or miniature hard drives.  This
removable storage media can store any digital data.  Most PDAs run computer
software, giving them many of the same capabilities as personal computers.  For

11

example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

21.   Based on my training, experience, and research, I know that the Target Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## <u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>

22.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Target Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

26.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use mobile phones to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet-based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

27.     I know, based on my training and experience, that individuals who peruse websites like the one where I posted the Advertisement often do so regularly. Familiarity with abbreviations and terms like "qv" can indicate that a person has experience with prostitutes, whether adult or child, in the past. I also know that evidence of engaging in prostitution on past occasions or evidence of a prior sexual interest in children can indicate an individual's intent on the date of the instant offense.

28.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B in mobile phones, computer hardware, computer software, and storage media.

29.     The warrant I am applying for would permit law enforcement to obtain from PICANCO the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices like iPhones, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face

16

with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2)

17

when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In The warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of PICANCO, to the fingerprint scanner of the device; (2) hold the device in front of the face of PICANCO and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.


[THIS SPACE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

30.     Based on the information provided above, I respectfully submit that there is probable cause to obtain a search warrant for the TARGET DEVICE, as more fully described in Attachment A, to seek the items described in Attachment B. Because the TARGET DEVICE is already in law enforcement's possession and the execution of this warrant does not involve the physical intrusion onto a premises, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.


/s/ Lori Robinson
Lori Robinson, Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone, on this 14th day of November, 2024.


HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**Equipment To Be Searched**

The equipment to be searched is a Samsung Galaxy phone, seized from Arthur

PICANCO on November 14, 2024 (the "Target Device").  The equipment is currently located at

the HSI Office at 275 Chestnut St., Manchester, NH. This warrant authorizes the forensic

examination of the equipment for the purpose of identifying the electronically stored information

described in Attachment B.

**ATTACHMENT B**
**Items to Be Seized**

I.  All records, in whatever form, that constitute evidence, fruits, or instrumentalities of 18 U.S.C. §§ 1591(a)(1) & (b)(1) and 1594(c) and involve Arthur PICANCO for the period from October 14, 2024 - present, including those related to:

   A.  Any correspondence with the Advertisement Number (as defined in the affidavit);

   B.  Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, electronic messages, or other digital data files) pertaining to the sex trafficking of children, attempt to engage in sex trafficking of children, commercial sex, prostitution, and a sexual interest in children;

   C.  Any web or browser history including but not limited to skipthegames, onlyfans, megapersonals, onebackpage, and adultsearch or any other site advertising escorts, commercial sex, prostitution, or the sex trafficking of children;

   D.  The payment, receipt, transfer, or storage of money or other things of value by PICANCO, pertaining to the sex trafficking of children, attempt to engage in sex trafficking of children, commercial sex, prostitution, and a sexual interest in children;

   E.  The travel or whereabouts of PICANCO on November 14, 2024;

   F.  For the Target Device:

      1.  evidence of who used, owned, or controlled the Target Device;

      2.  evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the

21

presence or absence of security software designed to detect malicious software;

3. evidence of the attachment of other computer hardware or storage media;

4. evidence of counter-forensic programs and associated data that are designed to eliminate data;

5. evidence of when the computer equipment was used;

6. passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7. records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

II. Serial numbers and any electronic identifiers that serve to identify the Target Device.

III. During the execution of the search of the Target Device described in Attachment A, law enforcement personnel are authorized to (1) press or swipe PICANCO's fingers (including thumbs) to the fingerprint scanner of the Target Device; (2) hold the Target Device in front of PICANCO's face and activate the facial recognition feature, for the purpose of attempting to unlock the Target Device in order to search the contents as authorized by this warrant.

**DEFINITIONS**

For the purpose of this warrant:

A. "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.     "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.     "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.     "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.